UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRADY EMONDS,

                    Plaintiff,

    v.

AMAZON.COM, INC, et al.

                  Defendant.

CASE NO. C19-1613JLR

ORDER DENYING PLAINTIFF'S
MOTION FOR ISSUANCE OF
NOTICE AND PLAINTIFF'S
MOTION TO TOLL THE
STATUTE OF LIMITATIONS

## I.   INTRODUCTION

Before the court is Plaintiff Brady Edmonds's motion for issuance of notice to

similarly situated individuals under 29 U.S.C. § 216(b).  (Certification Mot. (Dkt. # 40);

*see also* Certification Reply (Dkt. # 53).)  Defendants Amazon.com, Inc., Amazon

Logistics, Inc., and Amazon.com Services, Inc. (collectively "Amazon") oppose the

motion.  (Certification Resp. (Dkt. # 50).)  Mr. Edmonds also brings a motion to toll the

statute of limitations for any future opt-in plaintiffs during the pendency of the motion for

issuance of notice.  (Tolling Mot. (Dkt. # 52); *see also* Tolling Reply (Dkt. # 57).)

1   Amazon opposes this motion.  (Tolling Resp. (Dkt. # 54).)  The court has considered the

2   motions, the parties' submissions concerning the motions, the relevant portions of the

3   record, and the applicable law.  Being fully advised,[1] the court DENIES the motion for

4   issuance of notice and DENIES the motion to toll the statute of limitations.

## II.    BACKGROUND

6          Mr. Edmonds filed this action as a proposed nationwide collective action under the

7   Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA"), on October 9, 2019.

8   (*See* Compl. (Dkt. # 1).)  He brings one claim alleging that digital retailer Amazon

9   violated the FLSA by failing to pay overtime wages to Mr. Edmonds and similarly

10  situated individuals.  (FAC (Dkt. # 24) ¶¶ 114-122.)

**A.    Factual Background**

12         Mr. Edmonds's amended complaint alleges that Amazon, as a part of its "delivery

13  and logistics business," contracts with DSPs all around the United States.  (FAC ¶ 3).  He

14  further alleges that these DSPs hire DAs like Mr. Edmonds to deliver Amazon packages

15  within the DSPs' specific service areas.  (*Id.* ¶ 4.)

16         Mr. Edmonds alleges that as a DA in the greater Jacksonville, Florida area, he

17  regularly worked more than 40 hours in a workweek, but "[n]either Amazon nor the DSP

18  through whom Mr. Edmonds was paid" ever provided overtime compensation for hours

19  worked beyond 40 in a workweek.  (*Id.* ¶¶ 21-26).

20  //

---

22         [1] No party has requested oral argument, and the court considers it unnecessary for disposition of this motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

ORDER - 2

Mr. Edmonds does not bring his action against any DSPs.[2]  (*See generally* FAC.)
Instead, he brings his claim only against Amazon under a theory that Amazon qualifies as
a joint employer for individuals like Mr. Edmonds under the FLSA.  (*See id.* ¶¶ 61-63.)
In support of this theory, Mr. Edmonds alleges that Amazon dictated and directly
managed his employment and that of similarly situated DAs by, among other things:

- requiring all drivers to submit to an Amazon background check;

- participating in the decision to hire delivery drivers;

- providing training materials and training all drivers;

- requiring all drivers wear Amazon-branded clothing;

- dictating the manner and type of clothing drivers wear;

- determining the make, model, and style of delivery van to be used while delivering packages;

- requiring delivery vans contain Amazon insignia and logos (except when extra trucks are rented due to volume exceeding capacity during the busy season);

- requiring drivers to arrive at and load and unload Amazon packages from Amazon-owned fulfillment and warehouse centers for delivery;

- monitoring the performance of pre-trip and post-trip delivery van inspections;

- requiring packages to be delivered to Amazon customers according to an exact schedule that dictates the order of delivery and provides the exact route to utilize;

---

[2] Indeed, Mr. Edmonds does not name the DSP through whom he was hired and paid. (*See generally* FAC.)  As this court has already ruled, however, this does not disqualify his claim at this stage.  (*See* 4/15/20 Order (Dkt. # 42).)

• requiring drivers to report problems delivering packages directly to Amazon;

• controlling the method and manner of troubleshooting delivery issues;

• tracking delivery performance including but not limited to the number of

packages delivered each day, the location of the driver at any given time, and the

efficiency of the deliveries as reported through Amazon handheld devices or the

Amazon Flex application for smart phones;

• supervising the work of each driver on a daily basis;

• evaluating the performance of each driver on a periodic basis in accordance

with Amazon specific policies and procedures; and

• disciplining drivers up to and including termination.

(*Id*. ¶ 48.)

In his description of how Amazon allegedly dictated and directly managed the employment of the DAs, Mr. Edmonds does not allege that Amazon exercised control over the DAs' rate or method of payment.  (*See generally id*.)  Instead, he alleges that "the DSPs are solely dependent on payments made by Amazon to make regularly scheduled payroll" to the DAs.  (*Id*. at ¶ 53.)

In support of forming a proposed class that includes all local delivery drivers outside Washington state, Mr. Edmonds submits declarations from himself and six additional DAs.  (*See* Botros Decl. (Dkt. # 41) ¶ 18, Ex. Q ("Brown Decl."; "Coleman Decl."; "Danielson Decl."; "Edmonds Decl."; "Garcia Decl."; and "Gordon Decl."); Carnegie Decl. (Dkt. # 45-1) (collectively, "DA Declarations" or "DA Decls.").)  These

//

DAs worked in six locations across four states.[3]  (*See* DA Decls.)  Like the amended complaint, these declarations describe a system where "[t]he entire delivery process, from start to finish, was controlled by Amazon."  (*See, e.g.*, Edmonds Decl. ¶ 28.)  These declarations do not describe a system where Amazon issued any payments to DAs, but instead uniformly state that "payroll ran through the DSP."  (Brown Decl. ¶ 10; Coleman Decl. ¶ 10; Danielson Decl. ¶ 11; Edmonds Decl. ¶ 10; Garcia Decl. ¶ 10; Gordon Decl. ¶ 10; Carnegie Decl. ¶ 10.)

As part of its declarations, Amazon submits a list of job postings for DAs from September 2018 that Mr. Edmonds's counsel filed on behalf of the plaintiffs in a separate action, *Gibbs v. MLK Express Services, LLC*, No. 18-0434, 2019 WL 2635746 (M.D. Fla. June 27, 2019).[4]  (Ramsey Decl. ¶ 7, Ex. 1 (Dkt. # 51).)  The majority of these job postings describe the positions with day rates.  (*See generally id.*)  Some, however, provide for hourly rates, guaranteed overtime, or both.  (*See id.* at 12 (providing a daily payment range and expressly stating "Trucking payment: Hourly"), 21 (stating salary is "$15.00 to $18.50/hour," "**OVERTIME GUARANTEED**," "extra shifts and overtime is always available," and listing "Overtime Pay" as a benefit), 37 (advertising that "Drivers start at $14 an hour" and "[o]vertime is paid at a rate of one and a half times the normal hourly wage"), 56 ("[O]vertime rate [is] paid after 8 hours worked per day."),

---

[3] Specifically:  Baton Rouge, LA (Brown Decl. ¶ 6); Memphis, TN (Coleman Decl. ¶ 6); Eagan, MN (Danielson Decl. ¶ 6); Jacksonville, FL (Edmonds Decl. ¶ 6; Gordon Decl. ¶ 6); Saint Petersburg, FL (Garcia Decl. ¶ 6); and Gainesville, FL (Carnegie Decl. ¶ 6).

[4] In *Gibbs*, plaintiffs sought precertification for a nationwide class of DAs alleging overtime violations by Amazon as a joint employer. 2019 WL 2635746 at *1-2.

1 | 79 (drivers can make "up to $170.00 per day," listing "Overtime Pay" as a benefit, and

2 | stating that employees receive "[o]vertime by the day, after 8 hours worked"), 86

3 | (providing a daily payment range of "120 to $140 per day (paid hourly)").)  Amazon also

4 | provides its own exhibit from the *Gibbs* action from the same job posting site in October

5 | 2018, with many more examples of DA job postings that did not provide for day rates

6 | and promised hourly pay, overtime, or both.  (*See* Ramsey Decl. ¶ 8, Ex. 2.)

7 | **B.      Procedural Background**

8 |          Mr. Edmonds now asks the court to permit notice to be sent to the following

9 | similarly situated drivers, also referred to as Delivery Associates ("DAs"):

10 |
11 |
12 |
> All individuals employed as Amazon local delivery drivers or Delivery
> Associates (outside the state of Washington)—through a third-party delivery
> company or Delivery Service Partner ("DSP")—who were paid a day rate
> since October 9, 2017 and were not paid overtime premiums when they
> worked over forty hours in one or more workweeks.

13 | (Certification Mot. at 2.)

14 |          Additionally, Mr. Edmonds asks the court to:  (1) require Amazon to "identify all

15 | members of the proposed class";[5] (2) permit Mr. Edmonds's counsel to send notice to

16 | these individuals "via U.S. Mail, email, and text messages," in addition to postings on a

17 | website and at Amazon fulfillment centers nationwide; (3) approve a 90-day opt-in period

18 | for these individuals; (4) allow Mr. Edmonds's counsel to send a reminder notice via

19 | email and text 45 days into this notice period; and (5) allow proposed class members to

20 |

21 |
22 |
---
[5] Specifically, Mr. Edmonds requests that Amazon identify these individuals by name, last known mailing address, dates of employment, DSPs through which they worked, cell phone numbers, last four digits of their Social Security numbers, and personal email addresses. (Certification Mot. at 2.)

ORDER - 6

1  electronically sign and return the "Consent to Become and Opt-In Plaintiff" form.

2  (Certification Mot. at 2-3.)

### III.    ANALYSIS

**A.    Legal Standard**

    1.  <u>Preliminary Certification</u>

        Under the FLSA, a plaintiff may bring a collective action on behalf of himself and "similarly situated" employees.  29 U.S.C. § 216(b).  The Ninth Circuit has held that plaintiffs may litigate jointly under the statute if they "(1) claim a violation of the FLSA, (2) are 'similarly situated,' and (3) affirmatively opt in to the joint litigation, in writing." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018).  While the statute does not describe a process for evaluating collective proceedings, courts generally choose "to evaluate the propriety of the collective mechanism—in particular, plaintiff's satisfaction of the 'similarly situated' requirement—by way of a two-step 'certification' process."  *Id.* (citing 1 McLaughlin on Class Actions § 2:16 (14th ed. 2017)); *see also Khadera v. ABM Indus., Inc.*, 701 F. Supp. 2d 1190, 1193-94 (W.D. Wash. 2010) (noting trend and applying two-step process).

        The first stage is preliminary certification, where notice is issued to the proposed collective members "conditioned on a preliminary determination that the collective . . . satisfies the 'similarly situated' requirement of section 216(b)."  *Campbell*, 903 F.3d at 1109 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)).  Assuming the collective action survives the first stage, the second stage comes "at or after the close of relevant discovery" when "[t]he employer can move for decertification of the

1    collective action for failure to satisfy the similarly situated requirement in light of the

2    evidence produced to that point." *Campbell*, 903 F.3d at 1110.

3         The court's review for preliminary certification is "sometimes described as

4    requiring 'substantial allegations,' sometimes as turning on a 'reasonable basis' but in

5    any event is loosely akin to the plausibility standard, commensurate with the stage of the

6    proceedings." *Id.* at 1109 (collecting cases).  Review at this stage is "typically focused

7    on a review of the pleadings," though it may also "be supplemented by declarations or

8    limited other evidence." *Id.*  While the plaintiffs' burden at this stage is light, "the

9    district court cannot function as a rubber stamp for any and all claims that come its way

10   under this statute." *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929 (D. Ariz. 2010).

11        2.  Similarly Situated

12        The FLSA "does not provide a definition of 'similarly situated,' on which access

13   to the collective mechanism typically turns." *Campbell*, 903 F.3d at 1100.  In *Campbell,*

14   the Ninth Circuit rejected both widespread approaches to defining "similarly situated" as

15   used in 29 U.S.C. § 216(b). *Id.* at 1111-17; *Senne v. Kansas City Royals Baseball Corp.*,

16   934 F.3d 918, 947 (9th Cir. 2019) (describing how *Campbell* "rejected both the minority

17   approach to FLSA collective certification—which treats a FLSA collective as analogous

18   to a Rule 23(b)(3) class—and the majority 'ad hoc' approach") (citations omitted).

19   Instead, the court is tasked with determining if "in light of the collective action's reasons

20   for being within the FLSA," plaintiffs are "alike with regard to some *material* aspect of

21   their litigation." *Campbell*, 903 F.3d at 1114 (emphasis in original).

22   //

1    In sum, based on the Ninth Circuit's guidance the court addresses whether Mr.

2  Edmonds has carried his burden to show, under a lenient factual standard, that his

3  allegations are of such a nature that the proposed collective is alike with regard to an

4  aspect of their claim that is both material and connected to alleged violations of the FLSA

5  that are common to the proposed collective.

6  **B.    Similarity of the Proposed Collective**

7       1.   Mr. Edmonds's Proposed Collective

8    Mr. Edmonds alleges that the proposed collective is connected because "members

9  have all been subjected to the same policies that violate the FLSA, namely they have

10  been paid flat rates each week with no premium compensation for overtime hours

11  worked."  (FAC ¶ 87.)  They are "similarly situated in their claims against Defendants,"

12  he alleges, "because their claim[s] that Defendants employed or jointly employed them

13  rely on a common set of facts regarding Defendants' control over their employment."

14  (*Id.* ¶ 88.)

15    What Mr. Edmonds does not meaningfully allege, however, is that "the same

16  policies that violate the FLSA," i.e., the alleged failure to pay overtime, stem from

17  Amazon or any other source that connects a nationwide collective of DAs paid by

18  potentially hundreds of DSPs.  (*See generally id.*)  Amazon contends that this failure to

19  allege a common, nationwide unlawful pay policy is fatal to Mr. Edmonds's preliminary

20  certification efforts.  (Certification Resp. at 12.)  Amazon argues that under *Campbell*,

21  "the existence of a common unlawful policy is central to the 'similarly situated'

22  analysis."  (Certification Resp. at 14 (citing *Campbell* 903 F.3d at 1120).)  Mr. Edmonds

1    contends that *Campbell* mandates that plaintiffs are similarly situated "to the extent they

2    share a similar issue of law or fact material to the disposition of their FLSA claim."

3    (Certification Mot. at 14 (citing *Campbell* 903 F.3d at 1117).)

4        Under *Campbell*, the proposed collective members are similarly situated if they

5    are alike in a material way "in light of the collective action's reasons for being within the

6    FLSA." 903 F.3d at 1114.  Recent decisions in the circuit illustrate what this requirement

7    entails.  In *Campbell*, plaintiffs alleged that the defendants had a "tacit, Department-wide

8    policy discouraging the reporting of earned overtime." 903 F.3d at 1116.  There, the

9    district court erred when it "focused less on whether there was adequate evidentiary

10   support for the posited policy, and more on the overall sameness of the Officer's

11   employment circumstances."  *Id*.  In *Senne*, the Ninth Circuit upheld certification for a

12   collective overtime claim under the FLSA brought by minor league baseball players.  934

13   F.3d at 949.  Similar to *Campbell*, the Court noted that a critical factor of this decision

14   was "that plaintiffs allege a single, FLSA-violating policy."  *Id*.

15       While both *Campbell* and *Senne* involved review at the decertification stage of a

16   collective action, they were concerned with the nature of plaintiffs' allegations, not just

17   the evidentiary support uncovered through discovery.  *See Campbell*, 903 F.3d at 116;

18   *Senne*, 934 F.3d at 949; *see also Fernandez v. Bank of Am., N.A.*, No. CV 17-6104-MWF

19   (JCX), 2019 WL 3059150, at *2 (C.D. Cal. Mar. 8, 2019) ("[T]he Ninth Circuit's

20   construction of the term 'similarly situated' [is] applicable equally to both steps of the

21   collective certification process.").  Therefore, while review is lenient for preliminary

22   certification, Mr. Edmonds's allegations must still be of a nature that shows the proposed

1   collective to be similarly situated with regard to the alleged FLSA-violating behavior.

2   This comports with how courts in this circuit have treated preliminary certifications both

3   before and after *Campbell*.  *See Fernandez*, 2019 WL 3059150, at *3 (finding plaintiffs

4   to be similarly situated at preliminary certification because plaintiffs alleged they were

5   "subject to a common plan, policy and practice [by defendants relating to] common

6   overtime violation under the FLSA");  *Smith v. Akal Sec. Inc.*, No. CV-18-01117-PHX-

7   SMB, 2019 WL 1932117, at *3 (D. Ariz. May 1, 2019) (finding plaintiffs to be similarly

8   situated in part because they were "subject to the same policy handbook and collective

9   bargaining agreement" and "were uniformly subject to [defendant's] illegal practice of

10  [a] written policy of deducting one-hour lunch breaks from their pay regardless of

11  whether employees took a lunch break"); *Misra v. Decision One Mortg. Co., LLC*, 673 F.

12  Supp. 2d 987, 993 (C.D. Cal. 2008) (finding that preliminary certification requires "a

13  modest factual showing sufficient to demonstrate that [the plaintiff] and potential

14  plaintiffs together were victims of a common policy or plan that violated the law").

15  While Mr. Edmonds contends that such a common unlawful policy is not required, he

16  offers no case law from this circuit to support that assertion.  (*See* Certification Reply at

17  4.)[6]

18

19       [6] Mr. Edmonds does cite a recent decision to preliminarily certify a nationwide class of
    drivers for FedEx in *Sullivan-Blake v. FedEx Ground Package Sys., Inc.,* No. CV 18-1698, 2019
    WL 4750141 (W.D. Pa. Sept. 30, 2019) to rebut this claim.  The court in *Sullivan-Blake*,
20  however, found that the defendants' arguments against preliminary certification improperly
    focused "on whether the potential opt-ins are in fact similarly situated to Plaintiffs."  *Id*. at *4.
    However, as noted above, courts in the Ninth Circuit have determined that the definition of
21  similarly situated is "applicable equally to both steps of the collective certification process."  *See*
    *Fernandez*, 2019 WL 3059150, at *2 (collecting cases).  Additionally, the named plaintiff in
22  *Sullivan-Blake* alleged that she had previously been paid overtime by FedEx, then FedEx

1        Mr. Edmonds points to a number of Amazon has policies that could support a

2   finding that Amazon is a joint employer for the DAs.  (*See* FAC ¶ 48).  However, the

3   FLSA does not bar Amazon from being a joint employer, and Mr. Edmonds does not

4   allege that Amazon violated the FLSA by acting as a joint employer.  Instead, Mr.

5   Edmonds alleges that Amazon violated the FLSA by failing to pay overtime wages to

6   DAs.  (*See* FAC ¶¶ 114-122.)  Thus, even if the court were to credit Mr. Edmonds's

7   claims that Amazon acted as a joint employer for the DAs in the proposed collective, Mr.

8   Edmonds must plausibly allege a material similarity among the potential plaintiffs with

9   regard to the denial of overtime payment beyond Amazon's alleged status as their joint

10  employer.  *See Campbell* 903 F.3d at 1114 (finding that the material similarity must be

11  "in light of the collective action's reasons for being within the FLSA.")

12       Mr. Edmonds fails to make that showing.  The complaint and DA Declarations

13  describe numerous ways in which Amazon exercised control over DAs's duties.  (*See*

14  FAC ¶ 48; DA Decls.)  But when it comes to payment of wages, they do not describe a

15  system where Amazon exercised a similar control or instituted any uniform policies

16  whatsoever.  (*See generally* FAC; DA Decls.)  Instead, they describe a system where

17  "payroll ran through the DSP."  (Brown Decl. ¶ 10; Coleman Decl. ¶ 10; Danielson Decl.

18  ¶ 11; Edmonds Decl. ¶ 10; Garcia Decl. ¶ 10; Gordon Decl. ¶ 10; Carnegie Decl. ¶ 10.)

19  //

20  //

21  _____

    "required her" to work for an independent service provider who did not pay overtime.  2019 WL

22  4750141 at *1.  This allegation provides more support for the existence of a common plan or
    policy to deny overtime than the allegations in Mr. Edmonds's complaint.  (*See generally*, FAC.)

1   Thus, they describe a maximum of eight unnamed DSPs at six different locations that did

2   not pay overtime earned by their DAs.[7]  (*See generally* FAC; DA Decls.)  The DAs

3   represent that "the manner and method of . . . pay" was "virtually identical" for DAs at

4   their delivery center regardless of which DSP employed them.  (DA Decls. ¶ 9.)  With the

5   exception of one DA who worked for two DSPs, however, no DA explains how he or she

6   could know the manner and method of pay for drivers for other DSPs at their delivery

7   center, let alone delivery centers where they did not work.  (*See generally* DA Decls.;

8   Danielson Decl. ¶ 10.)  In contrast, job postings from September and October of 2018

9   show a myriad of advertised payment methods that include hourly rates and promises of

10  overtime.  (Ramsey Decl. ¶¶ 7-8, Exs. 1-2.)  These job postings highlight the lack of

11  supported allegations of a common plan or policy that would tie together a nationwide

12  collective.

13      2.  The *Gibbs* Decision

14      As noted above, this is not the first time that Mr. Edmonds's counsel has sought to

15  preliminarily certify a national collective of DAs that deliver Amazon packages.  *See*

16  *Gibbs*, 2019 WL 2635746 (denying preliminary certification of a nationwide class of

17  DAs working at Amazon delivery centers).  Mr. Edmonds contends that the *Gibbs* court

18  applied Eleventh Circuit law, which endorses the *ad hoc* approach to the "similarly

19  situated" requirement.  (Certification Reply at 10-11; *see also Gibbs* at *4.)  In rejecting

20  //

21

22  [7] Since none of the DAs name the DSP that hired and paid them, it is impossible to know if there is overlap between the DSPs.  Eight is the maximum number assuming each DSP mentioned in the DA declarations is unique.

1    this *ad hoc* approach, the Ninth Circuit noted two flaws.  First, the *ad hoc* test operates at

2    a level of abstraction that "offers no clue as to what kinds of 'similarity' matter under the

3    FLSA."  *Campbell*, 903 F.3d at 1114 (emphasis omitted).  Second, the *ad hoc* test

4    improperly focuses on "fairness and procedural considerations" which "improperly

5    invites courts to import . . . requirements with no application to the FLSA."  *Id*. at 1115.

6    However, the Court also noted:  "We do not intend to preclude the district courts from

7    employing . . . a version of the *ad hoc* test modified so as to account for the flaws we

8    have identified."  *Id*. at 1117, n.21.

9        While *Gibbs* was decided by applying the *ad hoc* test, its central analysis on the

10   question of whether collective members were similarly situated still holds even under the

11   Ninth Circuit's definition set forth *Campbell*.  There, as here, the allegations were for a

12   collective of DAs that were paid a day rate, without proper overtime pay, subject to a

13   common pay policy that violates the FLSA.  (*Compare Gibbs* 2019 WL 2635746 at *6

14   *with* FAC ¶ 87.)  The court in *Gibbs* found that, when it came to a policy spanning DSPs

15   nationwide, the plaintiff's evidence did "not show Amazon engaged in, or has control of,

16   any common payment policy or plan which violates the FLSA."  *Gibbs*, 2019 WL

17   2635746 at *8.

18       *Gibbs* did not find this factor dispositive as it was applying the balancing *ad hoc*

19   test, which the Ninth Circuit has rejected.  But under *Campbell*'s definition of similarly

20   situated, as further clarified by *Senne*, the absence of a common policy or plan goes

21   directly to whether the proposed collective is alike "in light of the collective action's

22   reasons for being within the FLSA."  *Campbell* 903 F.3d at 1114.  In the absence of any

1    other plausible allegations tying the alleged nationwide failure to receive overtime pay to

2    a common material question of fact or law, the absence of a plausibly alleged common

3    plan or policy is dispositive.

4         Mr. Edmonds's failure to allege a common plan or policy across DSPs nationwide

5    to deny overtime pay leads the court to conclude that Mr. Edmonds has not met the

6    preliminary certification requirement of demonstrating a similarly situated nationwide

7    collective.  Mr. Edmonds motion to issue notice to similarly situated individuals is

8    DENIED.[8]

9    **C.    Failed Preliminary Certification and Dissemination of Notice**

10        A denial of preliminary certification precludes dissemination of notice and may be

11   with or without prejudice.  *See Campbell*, 903 F.3d at 1109.  If it is without prejudice,

12   then the district court may revisit the question of certification after further discovery.  *Id.*

13   (citing *Halle v. West Penn Allegheny Health System Inc.*, 842 F.3d 215, 224 (3d Cir.

14   2016)).  Here, however, Mr. Edmonds's motion did not fail due to insufficient evidence

15   of overtime violations under the FLSA; it failed because Mr. Edmonds did not allege a

16

17        [8] Amazon also raises arguments against preliminary certification rooted in judicial
18   efficiency and the difficulty of administering an action where DAs were hired and paid by
     potentially hundreds of DSPs.  (*See* Certification Resp. at 7-11.  The court notes that in
     *Campbell*, the Ninth Circuit took particular issue with the "fairness and procedural
19   considerations" prong of the *ad hoc* test when it rejected it.  903 F.3d at 1115.  The Court found
     that procedural considerations could theoretically be at odds with the mandate of FLSA, but they
20   "must mean more than the inconvenience, from the court's or defendant's viewpoint, of the party
     plaintiffs' choice."  *Id.* at 1116.  Under *Campbell*, the action would have to be "truly infeasible"
21   for procedural considerations to bar certification.  *Id.*  Since the court has determined that the
     proposed collective is not similarly situated, it does not confront the issue of whether the
22   arguments presented by Amazon, if accepted, would create such infeasibility.

1   common policy or plan that could establish that the proposed nationwide collective is

2   similarly situated.  As such, the court finds that it is proper to deny certification with

3   prejudice.

4          When there is denial with prejudice and opt-in plaintiffs have already joined the

5   suit, the opt-in plaintiffs "will be dismissed without prejudice to the merits of their

6   individual FLSA claims, and the original plaintiffs will be left to litigate alone."

7   *Campbell*, 903 F.3d at 1109.  As such the court finds it proper to dismiss without

8   prejudice the claims of the opt-in plaintiffs who have joined Mr. Edmonds's suit at this

9   time.

10         Having determined that preliminary certification of the proposed class is improper,

11  the court finds that Mr. Edmonds's request to "issue an Order tolling future Opt-in

12  Plaintiffs' statute of limitations as of March 26, 2020" (Tolling Mot. at 10) is no longer

13  applicable.  As there will be no "future Opt-in Plaintiffs" in the proposed collective, the

14  motion to toll the statute of limitations is DENIED.

15                            **IV.    CONCLUSION**

16         Based on the foregoing analysis, the court DENIES Mr. Edmonds's motion for

17  issuance of notice to similarly situated individuals (Dkt. # 40) with prejudice and

18  DENIES Mr. Edmonds's motion to toll the statute of limitations (Dkt. # 52).  The court

19  //

20  //

21  //

22  //

ORDER - 16

also DISMISSES without prejudice the claims of all opt-in plaintiffs that have joined Mr.

Edmonds's suit (*see* Dkt. ## 5-6, 28-32, 61, 64, 71.).

Dated this 9th day of October, 2020.

JAMES L. ROBART
United States District Judge

ORDER - 17